1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

9  **DARREN ALEXES HILTON,**

Civil No.       10-cv-2597-WQH(WMC)

10                              **Petitioner,**

11                                                    **REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE**
**JUDGE RE PETITION FOR WRIT**
**vs.**                                            **OF HABEAS CORPUS**

12

13  **MATTHEW CATE, Warden,**

14                              **Respondent.**

15          State prisoner Darren Alexes Hilton ("Hilton"), proceeding with the assistance of counsel,

16  seeks federal habeas relief through a First Amended Petition For Writ Of Habeas Corpus ("Petition")

17  pursuant to 28 U.S.C. § 2254 ("Petition").  (Dkt No. 4.)  He challenges his conviction by a jury in San

18  Diego County Superior Court Case No. SCS20032 of eleven counts of several sex crimes, with

19  additional true findings resulting in sentence enhancements, for which he received a total prison term

20  of seventy-seven years, four months to life.  He alleges as grounds for relief that the prosecutor

21  (1) improperly used four peremptory challenges to excuse prospective male jurors and (2) engaged

22  in improper argument to the jury.  Respondent filed an Answer, conceding the Petition was timely

23  filed and the claims are exhausted, but opposing habeas relief.  (Dkt No. 8.)  Hilton filed a Traverse.

24  (Dkt No. 11.)  The Court has reviewed the pertinent portions of the record in consideration of

25  controlling legal authority and, for the reasons discussed below, it is recommended the Petition be

26  **DENIED**.

27  **I.      BACKGROUND**

28          In its reasoned decision filed June 29, 2009 affirming the judgment on direct appeal, the Court

of Appeal summarized the underlying facts supporting each of the eleven criminal counts and associated allegations involving Hilton's sexual misconduct with four teenage girls during the years 2004, 2005, and 2006. (Lodg. 5, pp. 4-12.) This Court has reviewed the underlying facts as context for this report, but neither of Hilton's grounds for federal relief entails a challenge to the evidentiary basis for his convictions, nor in any other way requires reliance on the details of all his crimes in order to decide the Petition. Accordingly, they are not reproduced here.

A jury consisting of nine women and three men convicted Hilton of all tried counts: forcible rape; pandering by encouragement; forcible oral copulation; lewd acts upon a child 14 or 15 years of age; and oral copulation of a person under 18 years of age, in violation of the cited sections of the California Penal Code. (Lodg. 5, p. 2.) The jury also made true findings that the rape and forcible oral copulations were committed against more than one victim and that the two forcible oral copulation counts also included both kidnapping and kidnapping for money, in violation of the cited sections of the California Penal Code. (Dkt No. 4, 2:5-10.)[1]

At his February 27, 2008 sentencing hearing, the court denied Hilton's new trial motion alleging the court erred during voir dire in rejecting his argument the prosecutor improperly used peremptory challenges to excuse four male prospective jurors in violation of Batson v. Kentucky, 476 U.S. 79 (1986) ("Batson") and People v. Wheeler, 22 Cal.3d 258 (1978) ("Wheeler"). (Lodg. 5, pp. 2-3; *see* Lodg. 8, RT Vol. 10.) He appealed, alleging the same two grounds for relief as he presents here. The Court of Appeal affirmed the judgment, concluding "the court did not err in denying [Hilton's] *Wheeler/Batson* motions, and the prosecutor did not commit reversible misconduct."[2] (Id., p. 3.) Hilton petitioned the California Supreme Court for review, reasserting his arguments "the trial court erred by denying [his] motion to quash the jury venire in response to the prosecutor's exclusion

---

[1] Page numbers associated with docketed materials cited in this R&R refer to those electronically imprinted on the cited document.

[2] In rejecting Hilton's contention, the Court of Appeal summarized: "When the prosecutor excused prospective juror No. 36, defense counsel requested a sidebar conference and objected to those peremptory challenges, claiming the prosecutor's exclusion of four male prospective jurors indicated a pattern of exclusion based on gender. [¶] Following a recess, the court, indicating that men were a protected class and a prima facie showing of discrimination had been made, asked the prosecutor for an explanation for his exclusion of the four male prospective jurors. The prosecutor, indicating the prospective jurors were Caucasian males, stated he was unaware that men were a protected class. The court stated it believed Caucasian males were a protected class." (Lodg. 5, p. 13.) The trial court then proceeded through the second and third Batson steps.

10cv2597

of men from the jury," and prosecutorial "misconduct during argument by suggesting God was on the side of one of the victims."  (Lodg. 6, pp. 5, 23 (typography altered).)  That petition was summarily denied on September 17, 2009.  (Lodg. 7.)  "We construe 'postcard' denials . . . to be decisions on the merits," and "[a] decision on the merits necessarily implies that an application was 'properly filed.' " Gaston v. Palmer, 417 F.3d 1030, 1038 (9th Cir.2005).  Hilton pursued no collateral relief in state court before filing his federal Petition on December 16, 2010.

**II.     DISCUSSION**

      **A.     <u>Legal Standards For Federal Habeas Relief</u>**

      A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C.A. § 2254(a).  The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") controls review of Hilton's habeas petition.  *See* Lindh v. Murphy, 521 U.S. 320, 322-23 (1997).  AEDPA established a " 'highly deferential standard for evaluating state-court rulings,' " requiring "that state-court decisions be given the benefit of the doubt."  Woodford v. Visciotti, 537 U.S. 19, 24 (2002), *quoting* Lindh, 521 U.S. at 333 n.7.  "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary."  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003), *citing* 28 U.S.C. § 2254(e)(1).

      Federal habeas relief is warranted only if the result of a claim adjudicated on the merits by a state court "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" (28 U.S.C. § 2254(d)(1)), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" (28 U.S.C. § 2254(d)(2)).  To be found "unreasonable" under 28 U.S.C. § 2254(d)(1), application of the precedent "must have been more than incorrect or erroneous;" it "must have been 'objectively unreasonable.' "  Wiggins v. Smith, 539 U.S. 510, 520-21 (2003) (citation omitted).  A decision is "contrary to" federal law if (1) it applies a rule that contradicts governing Supreme Court authority, or (2) it "confronts a set of facts that are materially indistinguishable from" a Supreme Court decision but reaches a different result.  Early v. Packer, 537 U.S. 3, 8 (2002) (citations omitted); *see* Williams v. Taylor, 529 U.S. 362, 404-06 (2000) (distinguishing the standards

1    for "contrary to" and "unreasonable application of" federal law); *see also* Bell v. Cone, 535 U.S. 685,

2    694 (2002).  A federal court applies AEDPA standards to the "last reasoned decision" by a state court

3    addressing the claim.   Campbell v. Rice, 408 F.3d 1166, 1170 (9th Cir. 2005); *see* Ylst v.

4    Nunnemaker, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting

5    a federal claim, later unexplained orders upholding the judgment or rejecting the same claim rest upon

6    the same ground").

7         **B.    Ground One:  *Batson* Error**

8              **1.    Jury Selection Challenge**

9         Transcriptions of the jury selection proceedings at Hilton's trial are provided as Lodgment No.

10   8, "Augment Appeal Transcript."[3]  After *voir dire*, the prosecutor used his first four peremptory

11   challenges to excuse prospective jurors Nos. 1, 14, 23, and 36, who were "either white or Latino"

12   men.[4]  (Dkt No. 11-1, 2:24-25.)  When the fourth man was excused, Hilton's counsel requested a

13   sidebar conference where he objected that the prosecutor appeared to be using peremptory challenges

14   to eliminate an identifiable group of jurors, "either white men or men in general," in violation of

15   Batson.  (Id., 2:25-27.)  The trial court permitted Hilton to make a *prima facie* showing, then required

16   the prosecutor to answer the allegation of improperly discriminatory motive in the use of his

17   peremptory challenges.  (Lodg. 8, ART Vol. 2, pp. 182-188.)   The trial court found the reasons the

18   prosecutor proffered were sufficient to overcome Hilton's equal protection challenge and denied the

19   motion.  The jury ultimately selected was comprised of nine women and three men.

20        After his conviction, the trial court denied Hilton's new trial motion predicated on the same

21   grounds, among others.  (Lodg. 8, RT Vol. 10, pp. 952-964.) Hilton alleged unsuccessfully on appeal

22   that the prosecutor's gender-neutral reasons for excusing four prospective male jurors were pretextual

23   and do not withstand "the comparative juror analysis mandated by *Batson* and *Johnson* [*v. California*,

24

25   _____
         [3]   The Reporter's Transcript ("RT") is comprised of Volumes 1-10.  The Augmented Reporter's Transcript ("ART") is comprised of Volumes 1-2.

26       [4]  Hilton does not elaborate a Batson argument based on race or ethnicity.  The Court need only address
27   the alleged discriminatory gender-based exclusion.  *See* Turner v. Marshall, 63 F.3d 807, 812 (9th Cir. 1995)
     ("neither the Supreme Court nor the Ninth Circuit has recognized that the combination of race and gender, such
28   as 'black males,' may establish a cognizable group for Batson purposes"), *overruled on other grounds by* Tolbert
     v. Page, 182 F.3d 677, 685 (9th Cir. 1999) (*en banc*).

545 U.S. 162 (2005)]," in violation of his constitutional rights.  (Dkt No. 4, 9:26-28.)  He argues in his Petition federal relief is warranted because the "Court of Appeal misapplied the law to the facts in finding that the reasons given by the prosecutor for exercising his first four peremptory challenges to exclude men were not pretextual."  (Id. 9:12-14).  He insists "the decision of the California courts that Mr. Hilton was not denied Equal Protection as a result of the prosecutor's discriminatory exclusion of men as jurors was *both* contrary to clearly established federal law as interpreted by the United States Supreme Court, and an unreasonable determination of the facts in light of all the evidence presented in the State court proceeding."  (Dkt No. 11-1, 6:17-22, *citing* 28 U.S.C. § 2254(d)(1), (2).)

### 2.    Legal Standards

State law defines the right, purpose, and manner of exercising peremptory challenges.  Ross v. Oklahoma, 487 U.S. 81, 89 (1988).  In California, "no reason need be given for a peremptory challenge, and the court shall exclude any juror challenged peremptorily." CAL. CODE CIV. P. § 226(b) (the prosecutor has no obligation to articulate any reason before exercising a peremptory challenge unless and until the opposing party makes a *prima facie* showing of discriminatory motivation).

The California Supreme Court in Wheeler, 22 Cal.3d 258 applied the representative cross-section rule of the California Constitution to prohibit the use of peremptory challenges to systematically exclude jurors based on such characteristics as race, religion, or ethnicity.  *See* CAL. CODE CIV. P. § 231.5.  Clearly established United States Supreme Court authority also prohibits systematic exclusions on such bases.  Batson, 476 U.S. at 84, 106 (holding purposeful racial discrimination in the selection process violates equal protection).  "[T]he Constitution forbids striking even a single prospective juror for a discriminatory purpose." Snyder v. Louisiana, 552 U.S. 472, 478 (2008), *quoting* United States v. Vasquez-Lopez, 22 F.3d 900, 902 (9th Cir. 1994).  The Batson rationale extends to peremptory strikes based on gender.  J.E.B. v. Alabama, 511 U.S. 127, 128-29 (1994) (holding "that gender, like race, is an unconstitutional proxy for juror competence and impartiality," and "the Equal Protection Clause forbids intentional discrimination on the basis of gender, just as it prohibits discrimination on the basis of race"); Rice v. Collins, 546 U.S. 333, 340 (2006) ("discrimination in jury selection on the basis of gender violates the Equal Protection Clause").

Therefore, when caselaw discussed herein refers to "race," it is assumed the discussion applies equally to "gender."

\\

Courts presume peremptory challenges are exercised in a constitutional manner, and the racial or ethnic or other cognizable characteristics of prospective jurors, standing alone, do not prevent their exclusion. *See* Batson, 476 U.S. at 89-98; Wheeler, 22 Cal.3d at 278. The factual inquiry under both Wheeler and Batson is the same. The three-step "Batson framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process." Johnson v. California, 545 U.S. 162, 172 (2005), *citing* Batson, 476 U.S. at 97-98. "The first two Batson steps govern the production of evidence that allows the trial court to determine [at step three] the persuasiveness of the defendant's constitutional claim." Johnson, 545 U.S. at 171.

> Under our Batson jurisprudence, once the opponent of a peremptory challenge has made out a *prima facie* case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination. . . . The second step of this process does not demand an explanation that is persuasive, or even plausible. "At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."

Purkett v. Elem, 514 U.S. 765, 767-68 (1995) (*per curiam*), *quoting* Hernandez v. New York, 500 U.S. 352, 360 (1991) (parallel citations omitted) ("It is not until the *third* step that the persuasiveness of the justification becomes relevant," with the "ultimate burden of persuasion regarding racial motivation . . . never shift[ing] from[] the opponent of the strike").

To satisfy step one, "the defendant must first show he or she "is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." Johnson, 545 U.S. at 169, *quoting* Batson, 476 U.S., at 96. "[A] *prima facie* case of discrimination can be made out by offering a wide variety of evidence, so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose.' " Id., *quoting* Batson, 476 U.S. at 94. The inquiry ends if the defendant fails to make a *prima facie* showing at step

10cv2597

one. Batson, 476 U.S. at 96-97. If a defendant satisfies the step one showing, the burden shifts to the prosecution at step two to rebut the inference of bias by articulating a neutral reason for the peremptory strike. Purkett, 514 U.S. at 768. At step two, courts focus on the subjective genuineness of the asserted nondiscriminatory motive rather than its reasonableness. Id. at 769. The issue is the facial validity of the prosecutor's explanation. Hernandez, 500 U.S. at 363. As long as the reasons given are reasonably specific and neutral, even if the explanations are trivial, they are not deemed invalid. *See* Johnson, 545 U.S. at 171 ("even if the State produces only frivolous or utterly nonsensical justifications for its strike, the case does not end – it merely proceeds to step three").

Once the prosecutor gives his reasons, "[t]he trial court will then have the duty to determine if the defendant has established purposeful discrimination." Miller-El v. Dretke, 545 U.S. 231, 239 (2005), *quoting* Batson, 476 U.S. at 98; *see* Johnson, 545 U.S. at 170 (having "the benefit of all relevant circumstances, including the prosecutor's explanation," the trial judge decides "whether it was more likely than not that the challenge was improperly motivated"). "Step three of the *Batson* inquiry involves an evaluation of the prosecutor's credibility, . . . and 'the best evidence [of discriminatory intent] often will be the demeanor of the attorney who exercises the challenge' . . . ." Snyder, 552 U.S. at 477, *quoting* Hernandez, 500 U.S. at 364-65 ("In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed").

> [T]he rule in *Batson* provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it. It is true that peremptories are often the subjects of instinct, and it can sometimes be hard to say what the reason is. But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. A *Batson* challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false.

Dretke, 545 U.S. at 251-52 (internal citations omitted) (the "Court of Appeal's and the dissent's substitution of a reason for eliminating [a particular juror] does nothing to satisfy the prosecutors' burden of stating a racially neutral explanation for their own actions").

7

10cv2597

The characteristics of people the prosecutor did not strike are relevant to an evaluation of the prosecutor's explanations for striking a juror from a cognizable class. "Some stated reasons are false, and although some false reasons are shown up within the four corners of a given case, sometimes a court may not be sure unless it looks beyond the case at hand," hence "*Batson*'s explanation that a defendant may rely on 'all relevant circumstances' to raise an inference of purposeful discrimination," including, for example, "side-by-side comparisons of some black venire panelists who were struck and white panelists allowed to serve." Dretke, 545 U.S. at 240. If the prosecutor's proffered reason "applies just as well to an otherwise-similar [nonminority] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." Kesser v. Cambra, 465 F.3d 351, 360 (9th Cir. 2006) (*en banc*), *quoting* Dretke, 545 U.S. at 241, 252 (finding in that case that the "whole of the *voir dire* testimony subject to consideration casts the prosecution's reasons for striking [the particular juror] in an implausible light" because "[c]omparing his strike with the treatment of panel members who expressed similar views supports a conclusion that race was significant in determining who was challenged and who was not").

A trial court's finding of no discriminatory intent is a factual determination accorded great deference by reviewing courts because a finding "on the issue of discriminatory intent . . . 'largely will turn on evaluation of credibility.' " Hernandez, 500 U.S. at 364-65, *quoting* Batson, 476 U.S. at 98, n.21. "In addition, race-neutral reasons for peremptory challenges often invoke a juror's demeanor (*e.g.*, nervousness, inattention), making the trial court's first-hand observations of even greater importance." Snyder, 552 U.S. at 477 ("the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor"). "[D]eterminations of credibility and demeanor lie 'peculiarly within a trial judge's province,' . . . and we have stated that 'in the absence of exceptional circumstances, we would defer to [the trial court].' " Id. (citations and internal punctuation omitted).

### 3. The State Courts Reasonably Applied Controlling Law And Reasonably Found The Facts In Rejecting Hilton's *Batson/Wheeler* Claims

Hilton contends the prosecutor at his trial used his first four peremptory strikes against

1   Prospective Jurors Nos. 1, 14, 23, and 36  with the purposeful discriminatory intent to remove men

2   from the jury.  He argues:

> The facts here show (1) the prosecutor deliberately excused men from
> the jury in a sex case, and when challenged on it first stated he did not
> think that men were a cognizable group.  When that was shown to be
> wrong, the prosecutor back pedaled and g[a]ve what were purported to
> be gender neutral reasons for the exclusion of four men before he was
> challenged on it by the petitioner.  The prosecutor's reasons were
> pretextual and would not withstand the comparative juror analysis
> mandated by *Batson* and *Johnson*, and the petition should be granted
> on that basis.

8   (Dkt No. 4, 9:22-28.)

9       As Hilton suggests, the sidebar discussion during jury selection reveals as a threshold matter

10  that the prosecutor appears to have thought "men" were not a cognizable class for purposes of

11  discriminatory exclusion prohibitions:  "Well, number one, first of all, . . . I was unaware that men

12  were somehow a protected class," inquiring whether there was "a case holding that Caucasian males

13  are a protected class when it comes to jury selection?"  (Lodg. 8, ART Vol. 2, 183:16-23.)  Defense

14  counsel stated he believed there was such a case.  (Id. 183:25-27.)  The trial court added:  "It is my

15  understanding, again without having the case in front of me as well, that Caucasian males are a

16  protected class."  (Id.184:5-7.)  The prosecutor then stated his gender-neutral reasons for excusing

17  those prospective jurors.  (Id. pp. 184-186.)  "Defense counsel urged the court to find the challenges

18  violated case law because, while the prosecutor's explanation might be true, 'the court could

19  reasonably conclude that there's more to it than that' because all of the victims were women."  (Lodg.

20  5, p. 15, quoting defense counsel.)  While it could be inferred from his professed ignorance that men

21  are a cognizable class for Batson purposes that the prosecutor wanted to exclude or minimize the

22  number of men serving on Hilton's jury based on group bias, the trial court nevertheless credited the

23  individualized, non-gender-based reasons articulated for each of those peremptory challenges. As

24  summarized by the Court of Appeal:

> The court denied Hilton's *Wheeler/Batson* motion, finding there
> was no indication the prosecutor excluded the four prospective jurors
> solely because they were males, and there were "justifiable reasons" for
> their exclusion.  The court indicated that a number of other males were
> excluded for cause because they stated they could not be fair or
> impartial, and it did not appear the prosecutor was attempting to get an
> all-female jury.  The court added it was denying the motion without

9

prejudice, and defense counsel could bring the motion again if he felt he had a "renewed basis" for doing so.

. . .

Hilton did not renew his *Wheeler/Batson* motion during the trial. However, after the jury returned its verdicts, Hilton brought a new trial motion based in part on the court's denial of his *Wheeler/Batson* motion during voir dire. Hilton asserted that "[d]uring jury selection, the defense made a prima facie case that the prosecutor had systematically excluded male jurors, as evidenced by consecutive peremptory challenges of four males." Acknowledging he had been tried before a jury of three males and nine females, Hilton also stated that "[t]he justifications provided by the prosecutor for [the] challenges were woefully insufficient and could have likely been applied to any number of unchallenged, female panelists."

In denying the new trial motion, the court found the prosecutor had given a "very valid reason" for each of the prosecutor's peremptory challenges against prospective jurors Nos. 1, 14, 23 and 36, and stated the prosecutor's "nonbiased" reasons "did not discriminate at all against the White males."[5]

(Lodg. 5, pp. 15-16.)

The Court of Appeal identified the correct legal principles controlling review of this claim and discussed the Wheeler/ Batson standards, citing federal and state cases applying those principles in various scenarios. (Lodg. 5, pp. 16-19.) The court affirmed the judgment, correctly noting: "So long as the trial court makes a sincere and reasoned effort in evaluating the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal," and reviewing courts "presume that a prosecutor uses his or her peremptory challenges in a constitutional manner." (Id., p. 19; *see* Batson, 476 U.S. at 89-98; Wheeler, 22 Cal.3d at 278.)

Hilton contends that both the trial court and the Court of Appeal wrongly found the prosecutor's proffered reasons for excusing each of those four male jurors were sufficient because "a comparative juror analysis, as required by clearly established federal law . . . shows otherwise," citing Dretke, 545 U.S. 231 and Snyder, 552 U.S. at 478. (Dkt No. 11-1, 3:9-12.) However, as recognized

---

[5]  As a general principle, while not dispositive of this ground for relief, the Court of Appeal considered the composition of the seated jury: "Finally, the record shows the jury that convicted Hilton included three men, as Hilton acknowledged in his new trial motion and as his counsel pointed out during the hearing on that motion. The prosecutor's acceptance of three male jurors is an additional indication that he acted in good faith for a nondiscriminatory purpose when he exercised the peremptory challenges against prospective jurors Nos. 1, 14, 23 and 36. (See *People v. Stanley* (2006) 39 Cal.4th 913, 938, fn.7 [' While the fact that the jury included members of a group allegedly discriminated against is not conclusive, it is an indication of good faith in exercising peremptories, and an appropriate factor for the trial judge to consider in ruling on a *Wheeler* objection']." (Lodg. 5, p. 23 (citation omitted)).)

in Snyder, retrospective comparison of jurors based on a cold appellate record may be misleading, and "deference is especially appropriate where a trial judge has made a finding that an attorney credibly relied on demeanor in exercising a strike," as long as the record shows "that the trial judge actually made a determination" concerning the individual's demeanor.  Snyder, 552 U.S. at 479; *see also* People v. Lenix, 44 Cal.4th 602, 622, 627-28 (2008) (reviewing courts must remain "mindful that comparative juror analysis on a cold appellate record has inherent limitations" in a review dependant upon the totality of the circumstances) (citation omitted).   Despite its inherent limitations, "[c]omparative juror analysis is evidence that . . . must be considered when reviewing claims of error at Wheeler/Batson's third stage when the defendant relies on such evidence and the record is adequate to permit the comparisons," but it is not necessarily dispositive.  Lenix, 44 Cal.4th at 607.  Standing alone, comparative juror analysis will not warrant a conclusion on appeal that there was discriminatory intent.  Rather, it is but one consideration to be assessed in the totality of the circumstances.  Id., *citing* Dretke, 545 U.S. 213 *and* Snyder, 552 U.S. 472.  "Reasonable minds reviewing the record might disagree about the prosecutor's credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination."  Rice, 546 U.S. at 341-42.

### a.     **Prospective Juror No. 1**

The *voir dire* of Prospective Juror No. 1 ("No. 1") appears at Lodg. 8, ART Vol. 1, pages 96, 109-110.  In finding no basis to disturb the trial court's determination the prosecutor was not motivated by impermissible group bias in excusing No. 1, the Court of Appeal summarized:

> As already discussed, a prosecutor's mere "hunch" about a prospective juror may adequately justify the exercise of a peremptory challenge against that prospective juror so long as the challenge was exercised for reasons other than impermissible group bias. (*People v. Williams* [1997], 16 Cal.4th [635], 664.)

> Here, substantial evidence shows the prosecutor's exclusion of prospective juror No. 1 was based on a permissible group-neutral "hunch."  During voir dire, prospective juror No. 1 stated he had no children, he had no spouse or any significant personal relationship, he was retired, and he spent most of his working career in the travel and electronics industries.  The prosecutor later explained to the court that he dismissed prospective juror No. 1 because he appeared to be a loner who had no children and no significant others, appeared apprehensive and withdrawn, and appeared to be someone who did not interact well in a group.  The prosecutor also explained that he was looking for jurors who would interact and communicate with others in a group, and

1

> he believed prospective juror No. 1 was not that type of individual.
> The record thus amply supports the prosecutor's gender neutral reasons,
> which can properly be characterized as a permissible "hunch," for
> excusing prospective juror No. 1.

(Lodg. 5, pp. 19-20; *see also* Lodg. 5, p. 13.)

\\

Hilton faults both the trial court and the Court of Appeal for finding the prosecutor's proffered

reasons were not pretextual because purportedly neither court conducted a comparative juror analysis

and thus unreasonably applied clearly established federal law governing <u>Batson</u> /<u>Wheeler</u> claims. He

undertakes such a comparison:

> In reviewing the reasons given for excusing specific jurors, the
> California Court of Appeal found there was substantial evidence to
> support that the exclusion of potential juror number 1 as based upon the
> prosecutor's "group-neutral 'hunch'." The reasons given . . . [were] that
> he had no children, he was retired, he spent most of his time traveling
> and in the electronics industry, and he had no spouse or other
> significant personal relationship. Prospective juror number 13, a
> woman, was accepted by the prosecutor, and she gave answers similar
> to those given by excluded prospective juror number 1. Prospective
> juror number 13 stated she had no children, was retired from the San
> Diego Union-Tribune, and had no spouse or significant other.

(Dkt No. 4, 7:22-8:6; *see also* Dkt No. 11-1, 3:12-23: "The actions of the prosecutor in accepting a

potential female juror with the same characteristics that were given for excluding juror number 1

spoke louder than his words for excusing him," and purportedly "showed that being a loner was not

the deciding factor for his exclusion but because he was a man").)

Regarding the prosecutor's other explanation that No. 1 appeared apprehensive, Hilton argues:

> The prosecutor's other reason for excluding prospective juror number
> 1, that he was apprehensive, could not be reconciled with the
> prosecutor's acceptance of three prospective women jurors, numbers 3,
> 9, and 25, who [Hilton summarily alleges] appeared more apprehensive
> during *voir dire* but were accepted by the prosecutor.

(Dkt No. 4, 7:22-8:6.)

> The answers of juror number 1 also do not indicate apprehension, and
> there was nothing from his past record as a juror in a civil case that
> would indicate a reluctance to serve as a juror in a criminal case. When
> the panel was asked who had served in a civil case, juror number 1
> answer[ed] first, undercutting the prosecutor's claim he was
> apprehensive and withdrawn (1 ART 63, 2 ART 184).

(Dkt No. 11-1, 3:15-20.)

12

Respondent identifies a misstatement of the record in Hilton's representation that No. 1 "volunteered to answer"questions about his prior jury experience in support of his argument the prosecutor's strike explanation he thought No. 1 was apprehensive and withdrawn was mere pretext. In actuality, No. 1 did not volunteer information about his prior jury service, but rather responded to inquiries from the court.   (Dkt No. 8-1, 34:1-15, *citing* 1 ART 60-64.)   Finally, Respondent distinguishes the backgrounds of the four seated jurors to whom Hilton attempts to compare No. 1 (*i.e.*, Nos. 3, 9, 15, and 25) for purposes of a *prima facie* showing of discriminatory motive, to demonstrate dissimilarities from No. 1.   Unlike No. 1, all the comparative individuals except No. 13 were married or had children or both, whereas No. 1 was single, without children or a significant other.   (Dkt No. 8-1, 34:16-21.)

It is recommended the Court find from the *voir dire* record, the <u>Batson</u>/<u>Wheeler</u> hearings, and the Court of Appeal's analysis that the state courts reasonably applied the proper legal standards and reasonably found Hilton has not carried his burden concerning the peremptory exclusion of No. 1. The credibility of the prosecutor's impression No. 1 would not interact well with the group based on specific details associated with his lifestyle entails demeanor and credibility evaluations allocated to the trial court.   The considerable deference with which this Court must approach the state court result under AEDPA forbids a substitution of its own assessment on the merits.   <u>Rice</u>, 546 U.S. at 341-42. Rather, the Court is confined to ensuring the result was objectively reasonable.

> Here, the trial court credited the prosecutor's race-neutral explanations, and the California Court of Appeal carefully reviewed the record at some length in upholding the trial court's findings.  The state appellate court's decision was plainly not unreasonable.

<u>Felkner v. Jackson</u>, -- U.S. --, 131 S.Ct. 1305, 1307 (2011) (*per curiam*) (reversing and remanding a grant of federal habeas relief on a <u>Batson</u> challenge, applying the highly deferential AEDPA standards and giving the state-court decisions the required "benefit of the doubt").   Relief on alleged <u>Batson</u> error with respect to No. 1 should be **<u>DENIED</u>**.

### b.   **<u>Prospective Juror No. 14</u>**

The *voir dire* of Prospective Juror No. 14 ("No. 14") appears at Lodg. 8, ART Vol. 1, pages 65-66, 98-99.  The Court of Appeal summarized the prosecutor's defense of this strike:

13

    With respect to *prospective juror No. 14*, the prosecutor indicated he had deleted the information about this prospective juror from his electronic juror list and asked someone to refresh his memory about the individual's background information. Defense counsel indicated the prospective juror was a mechanic in the Navy, his wife was a high school attendance clerk, he had two adult children, and he had served as a juror in a personal injury case. The prosecutor explained that he dismissed prospective juror No. 14 because he did not want a juror whose previous experience was such that he might reach a decision by a preponderance of the evidence and because he wanted a juror who would listen with an open mind without the concept of preponderance of the evidence "in his head as opposed to the reasonable doubt standard the court [was] going to instruct on."

(Lodg. 5, p. 14.)

The Court of Appeal found substantial evidence supported the trial court's determination the prosecutor permissibly excluded No. 14:

    During voir dire, the court asked the prospective jurors for a show of hands of those who had previously served on a jury, and then asked who had previously served on a civil case. Prospective juror No. 14 raised his hand and indicated to the court he had served as a juror on a civil case in which the plaintiff was "suing a check cashing place for improper security." Prospective juror No. 14 later indicated that he had two adult children, did not know the name of the company where his son worked as a clerk, and he was not sure what kind of work his daughter did, but it was "[s]omething to do with whatever, you know, engineering, whatever."

    As already noted, the prosecutor explained to the court that he dismissed prospective juror No. 14 because he did not want a juror whose previous experience was such that he might reach a decision by a lower preponderance-of-the-evidence standard of proof. This reason is gender-neutral. Although Hilton maintains "[i]t is simply not believable that the prosecutor was concerned about that," the People point out, and Hilton does not dispute, that the only other prospective juror who had civil jury experience (prospective juror No. 1) was also dismissed by the prosecutor. Reviewing with great restraint the court's determination regarding the sufficiency of the prosecutor's justification for excluding prospective juror No. 14, as we must (*Lenix, supra*, 44 Cal.4th at pp. 613-614), we conclude the court did not err as the record supports the prosecutor's gender-neutral justification.

(Lodg. 5, pp. 20-21.)

Hilton again faults both the trial court and the Court of Appeal for finding the prosecutor's proffered explanations acceptable and for failing to conduct a comparative juror analysis, which he contends would reveal pretext. He argues "the prosecutor's concern that juror number 14 might decide the case using a *lower* standard of proof would indicate the juror would be more favorable to the

14

prosecution rather than the defense." (Dkt No. 4, 8:12-14; *see* Dkt No. 11-1, 4:16-20.)   In addition, he argues that although "the prosecutor's claim that prior civil jury service was one of his 'gender neutral' reasons for excusing prospective juror number 14 . . . this same reason was *not* given to justify the prosecution's challenge to prospective juror number 1 . . . ," the only other panel person with prior civil jury experience and whom the prosecutor also excluded.  (Dkt No. 4, 8:14-17.)  However, both the Court of Appeal and Respondent's Answer allude to portions of the record substantiating the prosecutor's additional reasons proffered to explain his decision to strike No. 14:

> The prosecutor added that he was especially concerned about prospective juror 14 because of his answers to questions. (2 ART 185.) This concern was a legitimate one which was supported by the record. Prospective juror 14 stated that his 28 year old son was a clerk, but the juror did not know the name of the company where the son worked. The juror was not sure what kind of work his daughter did. . . . (1 ART 98-99, 118.)

(Dkt No. 8-1, 30:21-27.)

Hilton does not address those additional gender-neutral reasons the prosecutor advanced for excusing No. 14.  It is recommended the Court find the record reflects the state courts reasonably found the prosecutor's explanations were gender-neutral and credible, in satisfaction of the <u>Batson</u> analysis.  Hilton has not carried his burden of persuasion a constitutional violation occurred in the peremptory removal of No. 14 from his jury.  According the requisite deference to the state court findings, relief on alleged <u>Batson</u> error with respect to No. 14 should be **DENIED**.

### c.   <u>Prospective Juror No. 23</u>

The *voir dire* of Prospective Juror No. 23 ("No. 23") appears at Lodg. 8, ART Vol. 1, pages 101, 124-125, 139-140.  The Court of Appeal summarized the record in finding substantial evidence supported the trial court's determination that the prosecutor permissibly excluded No. 23 on the stated grounds "he was chewing gum and 'had an attitude' that was not conducive to working in a group environment." (Lodg. 5, pp. 14, 21.) "Hilton does not dispute that [No. 23] was chewing gum during voir dire." (<u>Id.</u> p. 21.)  Applying the holding in <u>People v. Jordan</u>, 146 Cal.App.4th 232 (2006), a case affirming denial of a defendant's <u>Wheeler</u>/<u>Batson</u> motion targeting a gum-chewing prospective juror, the Court of Appeal stated:

> *Jordan* is on point and holds that a prospective juror's act of

chewing gum during voir dire is a proper and sufficient ground for exclusion of that prospective juror through the exercise of a peremptory challenge. [Citation.] We reject Hilton's claim that *Jordan* is distinguishable because, here, the prosecutor did not say the gum chewing was disrespectful. The record here, however, shows that although the prosecutor did not expressly state that prospective juror No. 23's gum chewing was disrespectful, he did cite the gum chewing as a gender-neutral reason for the exclusion and indicated that prospective juror No. 23 had a bad attitude. We conclude substantial evidence supports the court's finding on the credibility of the prosecutor's explanations.

(Lodg. 5, p. 22.)

Hilton acknowledges the prosecutor offered those gender-neutral reasons in defending his peremptory challenge to that prospective juror. (Dkt No. 4, 8:18-20.) He nevertheless characterizes as "uncritical acceptance of any reason" by the trial court, "in this case gum chewing," and "the approval of that reasons without any explanation as to why that trait indicted disrespect," as purported "erroneous application of the requirements of *Batson* and *Johnson* that the prosecution must offer more than unsubstantiated reasons for the exclusion of a specific juror." (Id., 8:24-28.) Hilton appears to confuse "insubstantial" with "unsubstantiated." The gum chewing by No. 14 is undisputed, and even trivial or frivolous explanations satisfy the specificity and neutrality requirements of Batson's step two. Johnson, 545 U.S. at 171. Without addressing the prosecutor's other stated concern that No. 23 had a "bad attitude," Hilton attempts to distinguish Jordan on the highly technical basis his prosecutor did not state that "the gum chewing showed a lack of respect for the court." (Dkt No. 4, 8:22-24.)

Respondent identifies several cases upholding peremptory challenges based solely on a juror's "demeanor, tone, and facial expressions" leading to "a hunch or suspicion that a peremptory challenge so based is legitimate." (Lodg. 8-1, 21:15-16, *citing, inter alia* Williams, 345 F.3d at 1109 and People v. Phillips, 147 Cal.App.4th 810, 819 (2007) (peremptory challenges based on "bare looks and gestures are race-neutral and not improper" (citations omitted).) It is recommended the Court find Hilton fails to offer any basis on which this Court may ignore the authority emphasizing the trial courts' unique role in assessing from observation the credibility of a prosecutor's gender-neutral explanations for exercising a peremptory challenge. *See, e.g.*, Snyder, 552 U.S. at 477; Hernandez, 500 U.S. at 364-65. Habeas relief for alleged Batson error with respect to No. 23 should be **DENIED**.

10cv2597

#### d.      Prospective Juror No. 36

The *voir dire* of Prospective Juror No.36 ("No. 36") appears at Lodg. 8, ART Vol. 1, page 130. The Court of Appeal upheld "the prosecutor's dismissal of [No. 36] based on the prosecutor's concerns about that [*sic*] he was a philosophy major." (Lodg. 5, p. 22.) It is undisputed the prosecutor confused the background of this prospective juror with that of another prospective juror. Hilton argues:

> . . . [T]he California Court of Appeal found the trial court did not err in accepting the prosecutor's reasons for excusing prospective juror number 36, even though the reasons given by the prosecutor *were wrong* and applied to another juror, prospective juror number 40, a woman.[6]  The prosecutor claimed he excluded prospective juror number thirty-six because he was single, had no children, was a Philosophy major, and had worked for the Union Tribune. Contrary to the prosecutor's claim, there was no indication that prospective juror number 36 was a Philosophy major or that he worked for the Union-Tribune. Prospective juror number 40, a woman, stated her boyfriend worked for the Union-Tribune. The claim that the prosecutor made a simple mistake, however, was undermined by his acceptance of prospective juror number 13 who, as noted earlier, was a woman who was retired from the Union-Tribune, so being employed by that newspaper belies the gender neutral reason.

(Dkt No. 4, 9:1-12.)

"[A] genuine 'mistake' engendered by faulty memory, clerical errors, and similar conditions is 'not necessarily associated with impermissible reliance on presumed group bias.' " (Lodg. 5, pp. 22-23, *quoting* People v. Williams, 16 Cal.4th 153, 188-89 (1997) ("First, a 'mistake' is, at the very least, a 'reason,' that is, a coherent explanation for the peremptory challenge . . . . Second, a genuine 'mistake' is a race-neutral reason").).

> Here, substantial evidence supports a finding that the prosecutor's exclusion of prospective juror No. 36 was based on a genuine but mistaken belief that prospective juror No. 36 was a philosophy major. The reporter's transcript of the voir dire proceeding shows that almost immediately after prospective juror No. 36 stated he was a bilingual teacher and a writer, prospective juror No. 40 stated he[7] was a

---

6  The Court of Appeal refers to Prospective Juror No. 40 as "he," whereas Hilton refers to No. 40 as "she." No. 40's gender is not entirely clear from the *voir dire* transcript. No. 40 told the court: "I'm in a long-term relationship. He's also a full time student." (Lodg. No. 8,  ART Vol. 1, 103:15-16.)  That response suggests a woman referring to her boyfriend, but not necessarily.  Later during *voir dire*, the trial court had No. 40 confirm her/his full-time student status pursuing courses of study previously identified as "anthropology and philosophy" (Id. 103:18-21), and confirm "you have a significant other who is also a student" in the journalism field (Id. 131:24-132:11). The recommended result here would be the same irrespective of No. 40's actual gender.

7  *See* footnote 6, above.

> fulltime student taking philosophy courses.  The record supports a reasonable inference that the prosecutor genuinely but mistakenly believed that prospective juror No. 36 was the fulltime student taking philosophy courses.

(Lodg. 5, p. 23.)

As noted by Respondent, "[a] prosecutor can dismiss a potential juror whose occupation, in the prosecutor's subjective opinion, would not render that juror suitable for the case being tried." (Dkt No. 8-1, 30:27-31:3, *citing, inter alia,* United States v. Maxwell, 160 F.3d 1071, 1075 (6th Cir. 1998) (young people, in particular college students).)  Respondent asserts the trial court properly denied the Batson motion as to No. 36 because "the challenge was based on the prosecutor's concern, and past experience, that philosophy majors and writers did not make good prosecution jurors.  (2 ART 185-186)."  (Id., 30:25-27.)  Respondent observes "neither Hilton nor the court ever challenged or corrected the prosecutor's mistaken belief that prospective juror 36 was a philosophy major working for the Union Tribune."  (Id., 31:17-19.)  "When the prosecutor makes an evaluation that the juror will be specifically biased because of an error, the mistake is a reason for that juror's dismissal unrelated to group bias."  (Id., 31:10-12, *citing* Williams, 16 Cal.4th at 189; *see* Phillips, 147 Cal.App.4th at 819.)  "The record thus reflects that the prosecutor made a genuine and reasonable mistake given the circumstances of voir dire in this case and that this genuine mistake was a gender-neutral reason for excusing prospective juror 36."  (Id., 31:19-22.)  The state courts reached that objectively reasonable result.  Relief on grounds of Batson error with respect to No. 36 should be **DENIED**.

In summary, it is recommended the Court find the state courts applied the proper three-step inquiry applicable to Batson challenges in an objectively reasonable manner in addressing Hilton's Ground One claims.  The Court of Appeal independently reviewed the record and reached the same conclusion as the trial court that the prosecutor at step two presented comprehensible reasons for each of the challenged peremptory strikes that were not inherently discriminatory.  Rice, 546 U.S. at 338 ("so long as the reason is not inherently discriminatory, it suffices"), *quoting* Purkett, 514 U.S. at 767-68.  At the third step, the Court of Appeal evaluated the persuasiveness of the proffered explanations, then reasonably found Hilton did not carry his ultimate burden of persuasion, as the opponent of the strike, regarding impermissible motivation.  Respondent notes that not only did defense counsel not

counter the prosecutor's explanations for excusing any of the four prospective jurors, but "[o]n the contrary, defense counsel agreed that the prosecutor's reasons were 'valid' and reasonable' . . . and merely claimed, without supporting facts, that the court should find gender bias because the victims of Hilton's crimes were women and because, if the prosecutor wanted an all-female jury, this desire might 'override' any other reason for the challenges.  (2 ART 186.)"  (Dkt No. 8-1, 31:23-28; *see also* Id. 31:28-32:4.)   Absent objective unreasonableness, the state court should not be disturbed.  28 U.S.C. § 2254(d).  For all the foregoing reasons, it is recommended the Court **DENY** Hilton federal habeas relief on Ground One.

### C.    Ground Two:  Improper Closing Argument

Hilton contends he was denied his right to a fair trial and due process of law "by the prosecutor's closing argument that God was on the side of one of the alleged victims in this case." (Dkt No. 4, 10:3-7, *citing* Darden v. Wainwright, 477 U.S. 168 (1986).)  A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  Darden, 477 U.S. at 181, *quoting* Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."  Smith v. Phillips, 455 U.S. 209, 219 (1982).  As summarized by the Court of Appeal:

> During closing argument, as he was discussing the crimes Hilton allegedly committed against Marcella, the prosecutor recounted Marcella's testimony that she had gone to the bathroom in the Mexican restaurant [after she made an excuse to get away from Hilton and his companion who had taken Marcella in their car] and telephoned her mother.  The prosecutor then said to the jury:
>
> "So what does Marcella do then?  Sometimes this may be an overworked word, but I don't think it is here ladies and gentlemen, *the Lord works in mysterious ways, and that day the Lord worked for Marcella*, that day in mid-July 2004 when she comes out of that bathroom --"  (Italics added.)

(Lodg. 5, p. 24; *see* Lodg. 8, RT Vol. 8, 796:7-8, 797:12-17.)

Defense counsel interrupted the prosecutor's argument and asked for a sidebar conference.  The Court of Appeal summarized:  "Outside the presence of the jury, defense counsel objected that the prosecutor's reference to the 'Lord works in mysterious ways' was an inappropriate attempt to bring

religion into the case and incur the favoritism of Christian members of the jury." (Lodg. 5, p. 24.)
Counsel moved for a mistrial or, in the alternative, an admonition that the prosecutor not make any
reference to "religious morals, concepts, slogans, phrases from the Bible, or anything else" and "also
asked the court to tell the jury they should reject any appeals to religious values or concepts in making
their decision and focus on the instructions." (Id.)  The prosecutor defended the allusion, stating
"argument allows parables of good behavior, parables of good moral standards, and the Bible is full
of stories like the Good Samaritan, and that's what we have here." (Id. p. 25.)  The prosecutor also
objected to any jury admonition because it would "instruct the jury they're to throw out all their moral
teachings when the law is based on that morality . . . ." (Id.)

> Indicating that case law permitted the prosecution to quote parts
> of the Bible and make references to biblical phrases to emphasize a
> point and finding the prosecutor's reference did not cause irreparable
> injury to Hilton's defense, the court denied his requests for a mistrial
> and an admonition to the jury.  The court added it did not believe the
> prosecutor was going to "turn this into a Sunday sermon," and his
> reference to the "Lord working in mysterious ways" was "within the
> bounds of reasonable argument" and did not appeal to "passion or
> prejudice or anything outside of the evidence." [¶]  . . . After the
> sidebar conference ended, the court told the jury:

> "Ladies and gentlemen, we're back on the record again.
> I just want to remind you that the arguments of counsel
> are not evidence and I've instructed you on that before,
> and I think you understand that what the instructions
> states [sic].  [¶]  So we'll allow the prosecutor to
> continue."[8]

(Lodg. 5, p. 25.)

In rejecting Hilton's requests for a mistrial or a jury admonition, the trial court also observed:

> I also think it came out during the testimony of witnesses
> themselves.  I think the witness was the one I believe stated that God
> was with me that day, or it might have been a question that you asked,
> I can't recall, but it did come up during the trial.

(Lodg. 8, RT Vol. 8, 799:7-12.)

Hilton argues "[t]he consideration of religious authority by jurors is also viewed as the
improper influence of extraneous authority for purposes of assessing juror misconduct in a federal

---

[8]   The prosecutor then resumed his argument:  "Continuing, Ladies and Gentlemen.  The Good
Samaritan enters Marcella's life at a critical point on that particular day in the most fortuitous set of facts one
can imagine. He's right here, checking out a pickup truck from his employer at Ball Honda. She comes out of
that Mexican food restaurant and makes contact with him." (Lodg. 8, RT Vol. 8, p. 801.)

proceeding," citing <u>Crittenden v. Ayers</u>, 620 F.3d 962, 990-91 (9th Cir. 2010). (Dkt No. 11-1, 9:5-8.) Not only is this not a case alleging *juror* misconduct, but also the opinion he cites was amended and superseded on denial of rehearing *en banc* by <u>Crittenden v. Ayers</u>, 624 F.3d 943 (9th Cir. 2010), holding a juror's misconduct in introducing a Biblical passage during deliberations did not violate the defendant's Sixth Amendment right to a jury verdict based upon evidence developed at trial.

\\

To be found unconstitutional, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." <u>United States v. Agurs</u>, 427 U.S. 97, 108 (1976). The Court of Appeal identified the controlling federal constitutional standard from <u>Darden</u>, 477 U.S. at 181, quoted in <u>People v. Harrison</u>, 35 Cal.4th 208, 242 (2005) ("A prosecutor's misconduct violates the Fourteenth Amendment to the federal Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process' "). Hilton's reviewing court concluded that the prosecutor's "religious references" were improper "because they suggested to the jury that a divine intervention had assisted Marcella, and thereby created an unnecessary risk that the jurors might abandon logic and reason and convict Hilton 'for reasons having no place in our judicial system,' " but that they did not amount to prosecutorial misconduct because "the prosecutor here did not ask the jury to consider biblical teachings when deliberating." (Lodg. 5, pp. 26, 27 (citation omitted).)

The Court of Appeal continued: "Even if we were to conclude the prosecutor committed misconduct by making those religious references, we would also conclude such misconduct did not violate Hilton's federal constitutional right to a fair trial and does not require reversal of the judgment." (Lodg. 5, p. 27.) The court identified four separate times on the record when the trial court reminded the jury, through formal instruction (CALCRIM No. 222)[9] or by referring to jury instructions circumscribing the appropriate scope of evidence the jurors could consider during deliberations, including immediately after the sidebar during the prosecutor's closing argument. (<u>Id.</u>, pp. 27-28; *see, e.g.,* Lodg. 8, RT Vol. 4, pp. 175,185-186, Vol. 8, pp. 751-752.) The court applied the unrebutted

---

[9] Evidence instruction CALCRIM 222 provides in part: "Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys will discuss the case, but their remarks are not evidence." (4 RT 175; 2 CT 282-283.)

presumption that jurors follow the court's instructions (*see* Weeks v. Angelone, 528 U.S. 225, 234

(2000)), in particular cautionary instructions (*see* United States v. Nelson, 137 F.3d 1094, 1106) (9th

Cir. 1998)), to conclude: "the prosecutor's misconduct did not irreparably damage Hilton's chances

of receiving a fair trial, it did not violate his federal constitutional right to a fair trial, it did not involve

the use of deceptive or reprehensible methods . . ." (Id., pp. 28-29.)

> Furthermore, the prosecutor's challenged remarks consisted of one sentence in a lengthy closing argument, the transcription of which consists of about 60 pages in the reporter's transcript. [Lodg. 8, RT Vol. 8, pp. 778-843.] Although it is not necessary here to revisit the incriminating evidence upon which the jury's verdicts rest in this matter, we observe the evidence supporting the convictions is overwhelming.[10]

> In light of the comparative insignificance of the prosecutor's improper religious references and the court's repeated admonitions to the jury that it not treat the prosecutor's arguments as evidence, we conclude . . . Hilton has failed to demonstrate a reasonable likelihood the jury construed the remarks in an objectionable fashion. The misconduct was harmless under any standard of prejudice.

(Lodg. 5, pp. 28-29.)

In addition to emphasizing that the "question before this Court is . . . whether the state court's

conclusion was an unreasonable application of clearly established federal law under 28 U.S.C. §

2254(d)(1)" (Dkt No. 8-1, 39:17-19), Respondent summarizes the strength of the evidence against

Hilton (*see* Dkt No. 8-1, pp. 40-42) and the relative insignificance of the prosecutor's passing remark:.

> While an appeal to religious authority should have been avoided, here, however, the prosecutor was merely telling the jury what the evidence already showed. Specifically, Marcella, Denise, and Carrillo all testified that Carrillo came to Marcella's rescue when Marcella asked him for assistance in escaping from Hilton. (5 RT 332-335, 381, 409-413.) Marcella had never met Carrillo. She took a tremendous risk. He could have proven more dangerous than Hilton. Instead, he acted as a good citizen (Samaritan) in electing to render aid.

(Dkt No. 8-1, 39:20-28 ("In short, there is no reasonable likelihood that the jury construed the

prosecutor's remarks as Hilton asserts").)

Hilton argues "in this case there was no inquiry, hearing, or even an admonition by the trial

---

[10]  In the Answer, Respondent reviews the factual detail presented through witness testimony and other evidence at trial in support of their -- and the state courts' result on this claim -- substantial evidence supports the convictions, including among other things the testimony of the minor girl victims, including Marcella, and the man who helped Marcella get away from Hilton.  *(See* Dtk No. 8-1, pp. 39-42.)

court to preclude the jury from considering the prosecutor's appeal to the higher power of religion." (Dkt No. 11-1, 9:8-11, 9:11-15:  "The conclusion by the California Court of Appeal that the prosecutor's appeal to the higher power of religion as extrinsic authority that God was on the side of one of his witnesses was not prejudicial misconduct, without any hearing or even a curative instruction, was an unreasonable application of the law to the facts because prejudice is presumed").) Contrary to Hilton's claims, the record shows the trial court held a hearing on this issue at sidebar, then reminded the jury that arguments of counsel are not evidence.  (Lodg. 8, RT Vol. 8, pp. 786-801.)

It is recommended the Court find Hilton overstates any reasonable import of the prosecutor's isolated allusion to "the Lord" made in passing during closing argument to describe the good fortune of Marcella's rescue, the underlying facts of which are supported by considerable trial testimony.  For these reasons, it is recommended the Court find the state courts identified and reasonably applied the proper constitutional standard to the facts of this case to reach an objectively reasonable result. Federal habeas relief on this ground should be **DENIED**.

### III.    CONCLUSION AND RECOMMENDATION

The Court submits this Report and Recommendation to United States District Judge William Q. Hayes under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.   For all the foregoing reasons, **IT IS HEREBY RECOMMENDED** this habeas Petition be **DENIED** in its entirety on grounds the Petitioner is not in custody in violation of any federal right.  **IT IS FURTHER RECOMMENDED** the Court issue an Order:  (1) approving and adopting this Report and Recommendation; and (2) directing that Judgment be entered denying the Petition.

**IT IS HEREBY ORDERED** no later than **October 19, 2011**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** any Reply to the Objections shall be filed with the Court and served on all parties no later than **November 9, 2011.**  The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's Order.  *See* Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d

1153, 1156 (9th Cir. 1991).

DATED: September 27. 2011

Hon. William McCurine, Jr.
U.S. Magistrate Judge, U.S. District Court

24